IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES ex rel.
BRUCE GARDNER,

        Plaintiff,

v.

PROOVE BIOSCIENCES, INC,
a Delaware corporation,

        Defendant.

**Civil Action No.**

**Filed Under Seal**

**Jury Trial Demanded**

---

## COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE FALSE CLAIMS ACTS AND ANTI-KICKBACK STATUTES

*Qui Tam* "Relator" Bruce Gardner brings this action on his own behalf and on behalf of the United States of America to recover civil damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq*, against Proove Biosciences, Inc. (Proove).

## INTRODUCTION

1.    Relators allegations relate to fraudulent billings by Proove to Government services, chiefly Medicare, and for violations of the Federal False Claims Act, 31 U.S.C. § 3729, *et seq,* Federal Anti-Kickback Statute, 42 U.S.C. § 1320-7b for

inducements made to generate improper referrals from a "Registry Arrangement," which is prohibited under 42 U.S.C. § 1320-7b and Stark 42 U.S.C. §1395.

2.      Proove developed a series of genetic tests designed to determine a patient's reaction to Opioids based on their genetic profile. These tests are only supported by Proove's studies, and lack an independent verification of their accuracy and medical necessity. Proove altered the results of their studies and algorithms to make the claim that their product is able to predict Opioid risk in 93% of cases. Proove then billed Government services, namely Medicare, for medically unnecessary genetic tests and engaged in a kickback scheme with physicians by entering into improper Registry Agreements to induce physicians to use their products. Physicians engaged in Professional Service Agreements with Proove and received remuneration from Proove above fair market value while simultaneously billing Medicare and other third party payers for services rendered in exchange for a physician's use of Proove tests. Proove then billed the tests to Medicare using inapplicable billing codes, which disguised the true nature of the genetic tests and ensured payment from Medicare. In June 2015 alone, Proove collected over One-Million-Eight-Hundred-Thousand ($1,800,000) Dollars from Medicare.

3.      Harm to the Government is continuing, and Proove billed over One-Million-Eight-Hundred-Thousand ($1,800,000) Dollars in fraudulent billings in June 2015, and billed Medicare over Four-Million-Eight-Hundred-Thousand

2

($4,800,000) Dollars in 2014 and 2015. This number is expected to drastically increase if Proove is permitted to continue billing Medicare.

4.      Further, Proove's test gives false indications of Opioid sensitivity and risk, which are used to adjust or deny Opiate treatment for individuals in severe pain – this causes a significant harm to the public.

## PARTIES

5.      Relator Bruce Gardner is the Vice President of Strategic Operations and is a citizen of the United States and resident of the State of California.

6.      Defendant, Proove Biosciences (Proove) is a Delaware Corporation with a physical address of 15326 Alton Parkway, Irvine, CA  92681.  Its registered agent is Legalzoom.com, Inc. located at 100 West Broadway, Suite 100, Glendale, CA 91210.  Proove's California Business Entity Number is C3273592.

7.      Proove Biosciences routinely conducts business in the State of Michigan and has engaged in Professional Services Agreements with physicians in the State of Michigan, which resulted in false and fraudulent billings to Government services, including Medicare.

3

## JURISDICTION AND VENUE

8.      This action arises under Federal statutes, namely the Federal False Claims Act, 31 U.S.C. §§ 3729 et seq.

9.      This Court maintains subject matter Jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) (False Claims Act) and 28 U.S.C. § 1331 (Federal Question).

10.     Under the broad venue provisions of the False Claims Act, a *Qui Tam* action "may be brought in any judicial district in which the defendant or, in the case of the multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred." §3732(a).

11.     Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) because: (i) Proove fraudulently bills for medically unnecessary services rendered in this Jurisdiction and committed other acts proscribed by 28 U.S.C. § 3729 – acts giving rise to this action – within this district; (ii) Proove solicited services from physicians located in this Jurisdiction in violation of Federal statutes, namely 42 U.S.C. § 1320-7b and 42 U.S.C.S. §§ 1395nn(a)(1); (iii) Proove engaged in research for its products conducted in this Jurisdiction and contracted with researchers residing within this Jurisdiction.

12.     Before filing this Complaint, Relator served a copy of the same upon the United States with a written Disclosure Statement, setting forth and enclosing all

material evidence and information that he possesses, pursuant to the requirements of 31 U.S.C. § 3730(b)(2).

13.     Relator has direct and independent knowledge, within the meaning of 31 U.S.C. §37300(4)(B), of the information on which the allegations set forth in this Complaint are based.   Relator is the original source of, and has direct and independent knowledge of, all publically disclosed information on which any allegations herein might be deemed based, and has voluntarily provided such information to the Government before filing this action.   Specific disclosures include:  (i) Daily deposit reports of Proove's receivables for 2014 and 2015 (up to July 2015); (ii) A fair market value analysis conducted by an independent firm; (iii) Professional Services Agreement for Proove contractors;  (iv) Information pertaining to CPT codes billed by Proove; (v) Abstracts of studies used by Proove to support the accuracy of its tests; (vi) Knowledge that Proove altered its algorithms to make its tests appear more accurate.

## GENERAL ALLEGATIONS

14.   Proove claims that it is a commercial and research leader in personalized medicine, and boats a portfolio of patent-protected genetic tests that help physicians "answer some of their most important concerns to improve care and reduce costs"[1].

15.   Proove offers a number of tests and continues to create new genetic tests. However, Proove's most popular tests are the Drug Metabolism Test and Opoid Risk Test.  These two (2) tests constitute the bulk of Proove's billings to Medicare.

16.   Proove believes that most RX pain medication abuse is due to genetics and claims that its tests can uncover a genetic predisposition to Opioid sensitivity and risk.  Proove believes that its tests can be used to change treatment protocol for patients receiving Opioids.

17.   Proove claims that its Opoid risk test has a 93% accuracy in predicting Opoid sensitivity in patients, and that physicians are able to predict Opioid risk with 50% accuracy without genetic testing.

18.   The support for this claim is cited as "Stratifying Patient Opioid Risk Tool (ORT) Scores Using Genetic Predisposition of Dopaminergic Imbalances," presented at the American Pain Society Annual Meeting 2014, Tampa Florida by Daniel Schwarz, MD.  The presenter of this study, Daniel Schwarz M.D., has since

---

[1] https://proove.com/

renounced Proove's testing as a misrepresentation and has left Proove's employment because Proove failed to follow the proper research protocol.

19.    Proove's claim that its test is 93% predictive is false. The genes tested by Proove's expensive genetic test only represent about 2% of the accuracy of the test or the genetic profile; this is widely known by Proove CEO Brian Meshkin and others in the organization, including but not limited to the CFO, the VP of Finance, the Director of Revenue Cycle, and individuals in Research and Development, including the Director of Research and Development and the Director of Clinical Research.

20.    Dr. Tobore Onojighofia, the Director of Research and Development for Proove and an unlicensed physician in the United States, was responsible for creating the algorithms that would generate a test score for the Narcotic Risk Profile and Opiate Risk assessment based on genetic testing. Brian Meshkin initially created an algorithm that was only 87% predictive of Opiate risk. However, this level of accuracy was barely above cheaper non-genetic tests used to determine Opiate Risk (SOAPP ORT[2]) that are simply questionnaires. Meshkin solicited

---

[2] Screener and Opioid assessment for patients with pain (SOAPP) is a tool for clinicians to help determine how much monitoring a patient on long term opioid therapy might require. The SOAPP is a simple five (5) or fourteen (14) question questionnaire. A score of four (4) or higher on the five (5) question test will identify 86% of those who actually turn out to be at high risk. The fourteen (14) item version is 91% effective at identifying those at high risk. This test costs virtually nothing

Dr. Tobore Onojighofia to alter the algorithm to make his test appear more accurate, up to 93%. This alteration of the algorithm resulted in false tests data to support Proove's claim that its tests are more predictive of Opioid risk that other cheaper alternatives, such as SOAP or ORT tests.

21. Dr. Tobore Onojighofia, resigned after sexual harassment allegations, but remained as a contractor with Proove Biosciences and receives remuneration of approximately 1% of tests billed plus a monthly fee.

22. Proove's claims are unsupported by medical evidence and are not proven to be medically necessary for Medicaid patients receiving treatment with Opioids when compared to cheaper alternatives that do not require expensive genetic testing.

23. Proove claims that its tests are supported by an IRB studies. However, Proove has yet to have their research presented in a peer reviewed scientific journal.

24. Further, Proove misrepresented data on at least three (3) other studies to achieve favorable results and increase the perceived statistical significance of its findings[3].

---

to administer and score. Similarly, the Opioid risk too is a five (5) question test that can be administered in five (5) minutes. For those with a low risk, the ORT was 94.4% accurate in predicting lack of aberrant behaviors. For those labeled as high risk, the ORT was 90.9% accurate in predicting aberrant behaviors.

[3] "Predisposing Risk in Injury Claims Exceeding 1yr: Predictive Assessment using Pharmacogenetics"; "Analgesia Perception of Prescription Opoids with Chronic Pain: Comparing Genotype to Pain VAS"; Multi-Center Study to Evaluate

25.     Even if supported by medical data, Proove's tests are not considered medically necessary by the Secretary of Health and Human Services.

26.     Medicare Part B (Medical Insurance) covers medically necessary clinical diagnostic laboratory services that are ordered by a practitioner.  It is a violation 31 U.S.C. §§ 3729 et seq. to bill for services that are not medically necessary to treat Medicare patients. 42 U.S.C. §1395y(a).

27.     The Authority to determine "medical necessity" is vested in the Secretary.  42 U.S.C. § 1395ff(a); see also Social Security Act § 1862(a)(1)(A).

28.     National Coverage Determinations are routinely issued by the Secretary, establishing the medical necessity.   See Memorandum Report: Coverage and Payment for Genetic Laboratory Tests, OEI-07-11-00011 June 12, 2012.  Medicare does not pay for preventive screening tests, except for those specifically authorized by statute (e.g., prostate-specific antigen test).  Id. at p.2.

29.     However, genetic tests used to diagnose or determine treatment in the presence of signs and symptoms of disease can be covered by Medicare if approval is granted by a Local Coverage Determination or a National Coverage Determination (NCD).   See *Secretary's Advisor Committee on Genetics, Health,*

---

Accuracy of the Medication Efficacy Differentiation (MED) Scale to Predict Hydrocodone Efficacy versus the Pain VAS Score

*and Society, Coverage and Reimbursement of Genetic Tests and Services*, February 2006, p.30.

30.     Currently, there is no LCD or NCD approving the use of genetic testing to determine Opioid risk or sensitivity.

31.     Instead of obtaining the required Medicare approval for its tests, Proove billed under multiple codes inapplicable to Proove's tests, which disguised the true nature of its tests.

32.     The improper codes used by Proove were namely G87150, "Identification by Nucleic Acid (CNA or RNA) probe…" and G0452, "Molecular Pathology Interpretation Code."  Both codes are inapplicable to the kind of genetic testing that Proove conducts.

33.     In addition, Proove used code "stacking" to obtain Medicare reimbursement for its tests by "stacking" various codes and disguising the true nature of Proove's tests.

34.    On information and belief, in January 2015, Proove obtained Z codes for its specific tests: ZBOLT; ZBOLV; ZBOLU. However, bills under these codes were denied by Medicare. After denial, Proove billed under G87150, G0452 and other inapplicable codes to receive reimbursement.

35.    Aware of the lack of clinical support for its tests and the infancy of medical research on the subject, Proove sells its tests by inducing physicians into a Professional Services Agreement (PSA) to become "investigators" in an Institutional Review Board (IRB) study whereby the physicians sell and administer Proove's tests to patients in exchange for a fee from prove and reimbursement from Medicare.

36.    Proove then bills Medicare approximately Five-Hundred-Fifty-Two ($552.72) Dollars and Seventy-Two Cents per test under improper procedure codes for medically unnecessary tests, resulting in Millions of Dollars in false billings to the Government for unnecessary services.

37.    Based on a review of Proove's daily deposit reports from Medicare billings, Relator conservatively estimates that actual damages are over Four-Million-Eight-Hundred-Thousand ($4,800,000) Dollars.

38.    Below is a chart depicting the monthly and two-year (2) totals billed and received from Medicare for each test:

| | Total Test Billed | Total Test Collected | Risk Test Total | Metabolism Test Total |
|---|---|---|---|---|
| **2014** | | | | |
| Sept | $157,897.17 | $14,808.31 | 20 | 4 |
| Oct | $1,957,088.25 | $281,059.25 | 458 | 123 |
| Nov | $3,923,824.51 | $540,217.95 | 851 | 224 |
| Dec | $501,519.57 | $59,832.13 | 84 | 38 |
| **Total** | $6,540,329.50 | $895,917.64 | 1413 | 389 |
| **2015** | | | | |
| Jan | $1,793,236.21 | $297,327.41 | 439 | 194 |
| Feb | $10,920.55 | $1,754.79 | 2 | 3 |
| March | $987,942.03 | $496,934.06 | 465 | 418 |
| April | $12,207.36 | $5,731.34 | 7 | 5 |
| May | $1,626,818.46 | $1,129,088.05 | 573 | 539 |
| June | $3,620,577.66 | $1,891,962.04 | | |
| July | $140,005.90 | $91,873.97 | | |
| **Total** | $8,191,708.17 | $3,914,671.66 | 1486 | 1159 |
| | | | 2899 | 1548 |
| 2 Year Total | **$14,732,037.17** | **$4,810,589.30** | | |

39.     Proove's total billings for 2014 and 2015 amount to Fourteen-Million-Seven-Hundred-Thirty-Two-Thousand-Thirty-Seven   (**$14,732,037.17**)   Dollars   and Seventeen Cents, for which Proove collected Four-Million-Eight-Hundred-Ten-Thousand-Five-Hundred-Eighty-Nine (**$4,810,589.30**) Dollars and Thirty-Cents. Proove fraudulently billed for four-thousand-four-hundred-forty-seven (**4,447**) invalid genetic tests, for which Proove is liable for civil monetary penalties exceeding Twenty-Four-Million-Four-Hundred-Fifty-Eight-Thousand-Five-Hundred (**$24,458,500**) Dollars.

## **VIOLATION OF THE FALSE CLAIMS ACT**

40.     Plaintiff, hereby incorporates paragraphs one (1) through forty-one (41) as if fully stated herein.

41.    The False Claims Act (FCA) provides, in pertinent part, that:

> (a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States, a false or fraudulent claim for payment or approval, (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government, (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government;. . . or (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,
> ***
> is liable to the United States Government for a civil penalty of not less than Five-Thousand ($5,000) Dollars, and not more than Ten-Thousand ($10,000) Dollars, plus three (3) times the amount of damages which the Government sustains because of the act of that person . . . .
>
> (b) For purposes of this section, the terms "knowing" and "knowingly" means that a person, with respect to information (1) has actual knowledge of the information, (2) acts in deliberate ignorance of the truth or falsity of the information, or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required. 31 U.S.C. § 3729.

42.    While the False Claims Act imposes liability only when the claimant acts "knowingly," it does not require that the person submitting the claim have actual knowledge that the claim is false. A person who acts in reckless disregard, or in deliberate ignorance of the truth or falsity of the information, also can be found liable under the Act. 31 U.S.C. 3729(b).

43.    In addition to its substantive provisions, the FCA provides that private parties may bring an action on behalf of the United States. 31 U.S.C. 3730 (b).

44. The FCA provides protection to *Qui Tam* relators who are discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of their employment as a result of their furtherance of an action under the FCA. 31 U.S.C. 3730(h).

45. For the purposes of the FCA, each false claim constitutes a separate "false claim."

46. By signing and certifying that Proove's claims were accurate and medically necessary, and by altering their genetic tests to appear equally or more accurate that virtually costless alternatives, Proove submitted false claims for reimbursement to the Government.

47. Further, by billing under inapplicable CPT codes and disguising the true nature of their tests – even after their initial claims were denied by Medicare – Proove submitted false claims for reimbursement to the Government.

48. The FCA reaches any person who knowingly assisted in causing the Government to pay a false claim. *United States ex rel. Marcus v.Hess*, 317 U.S. 537, 544-545 (1943).

49. Proove has submitted and continues to submit false claims for reimbursement to Medicaid for medically unnecessary tests.

50. Proove and a large number of its employees detailed above, including Brian Mershkin its CEO, knew that Proove's tests were ineffective, useless when

4

compared to costless alternatives, and that the algorithm used to generate tests results was altered in a way to falsely represent the accuracy of the test.

51.     The damages attributable to Proove's fraudulent billings for invalid tests are substantial; Proove billed Medicare for over Fourteen-Million-Seven-Hundred-Thirty-Two-Thousand-Thirty-Seven (**$14,732,037.17**) Dollars and Seventeen Cents, for which Proove collected Four-Million-Eight-Hundred-Ten-Thousand-Five-Hundred-Eighty-Nine (**$4,810,589.30**) Dollars and Thirty Cents**.**

52.     Further, Proove is liable for between Five-Thousand ($5,000) Dollars and Ten-Thousand ($10,000) Dollars for each false claim submitted to the Government, plus three (3) times the amount of the fraud loss attributable to Proove's conduct. 31 U.S.C. §3729(a)(1)(G), or Fourteen-Million-Four-Hundred-Thirty-One-Thousand-Seven-Hundred-Sixty-Seven ($14,431,767) Dollars in damages and Twenty-Four-Million-Four-Hundred-Fifty-Eight-Thousand-Five-Hundred ($24,458,500) Dollars in fines for a total of Thirty-Eight-Million-Eight-Hundred-Ninety-Thousand-Two-Hundred-Sixty-Seven (**$38,890,267**) Dollars.

## VIOLALTION OF STARK 42 U.S.C. §1395 AND ANTI-KICKBACK
## STATUTE 42 U.S.C. § 1320-7b

53.     Both the Stark Act and the Anti-Kickback Act prohibit a health care entity from submitting claims to Medicare based on referrals from physicians who have a financial relationship with the entity, unless a statutory or regulatory exception (or safe harbor) applies.  42 U.S.C.S. §§ 1395nn(a)(1); 1320a-7b(b).

54.     Falsely certifying compliance with the Stark or Anti-Kickback Acts in connection with a claim submitted to a Federally funded insurance program is actionable under the False Claims Act, 31 U.S.C.S. § 3729 et seq.

55.     Under the Stark Act, 42 U.S.C. § 1395nn, a physician has a financial relationship with an entity if the physician has an ownership or investment interest in the entity, or a Compensation Arrangement with it. 42 U.S.C. § 1395nn(a)(2).

56.     A "Compensation Arrangement" is defined as any arrangement involving any remuneration between a physician and an entity.  42 U.S.C.S. § 1395nn(h)(1)(A).

57.     Similarly, the Stark regulations define "Compensation Arrangement" as any arrangement involving remuneration, direct or indirect, between a physician and an entity. 42 C.F.R. § 411.354(c).

58.     "Remuneration," in turn, is defined under the Stark Act as any remuneration, directly or indirectly, overtly or covertly, in cash or in kind.  42 U.S.C.S. § 1395nn(h)(1)(B).

6

59.     The "one purpose test" states that if any purpose of the remuneration arrangement is to induce the service, a Stark violation is triggered.  The Affordable Care Act (ACA) states that a Stark violation is a per se violation of the False Claims Act.

60.     Here, Proove engages in a complicated kickback scheme where sales representatives recruit physicians to engage in a PSA and study protocol arrangement to test the effectiveness of Proove's tests.

61.     Sales representatives located throughout the country approach physicians and pitch the Professional Services Agreement (PSA), whereby physicians will receive compensation hourly for services performed in collecting, storing, packaging tests and analyzing the results of the tests.

62.     Physicians engage in the PSA and begin enrolling their patients in the IRB protocol, in turn administering Proove's tests to their patients as opposed to relatively costless alternatives.  Physician's then receive renumeration from Proove for conducting the tests and, according to IRB protocol, also receive reimbursement from third party payers, including Medicare.

63.     Physicians who engage in the PSA will treat their patients exclusively using Proove's tests over the tests of other competitors, or less expensive tests that do not require genetic testing (ORT SOAP-R).

7

64.     Proove receives reimbursement from Medicare and other insurers for the tests used; physicians bill Medicare for the office visit and the test interpretation.

65.     This type of arrangement is specifically precluded under the June 25, 2014, OIG Special Fraud Alert: *Laboratory Payments to Referring Physicians*.   This arrangement is an impressible Registry Arrangement as defined by the Special Fraud Alert.

66.     By nature of Proove's PSA, physicians are improperly inducted into using Proove's products and assisting in Proove's IRB protocol studies in violation of Stark 42 U.S.C. §1395 and Anti-Kickback statute 42 U.S.C. § 1320-7b.

67.     Two (2) prongs of the OIG's concerns are implicated here:  (i) Physicians are paid above fair market value for the services rendered; (ii) Proove's tests are not reasonable or necessary, as described above.

68.     Here, physicians are not only receiving compensation for preforming the tests at an inflated rate, but physicians are required under IRB protocol to bill Medicare or insurers for collecting and packaging the sample.  On information and belief, Proove initially billed Medicare under code for collecting and packaging the sample. Sometime later, Proove ceased billing for this service and then encouraged physicians to bill Medicare for collecting these samples under, thereby doubling physician compensation for the preformed services and making remuneration contingent on the volume of referrals.

69.     Physicians who executed a PSA essentially received double compensation (from Proove and third party payers) and were induced to use Proove's tests which lead to corruption of medical judgment, overutilization, and increased costs to the Federal health care programs and beneficiaries in addition to unfair competition. Indeed, this process induced physicians to order tests from Proove that provided them with remuneration rather choosing than the laboratory that provides the best, most clinically appropriate service.  This is how Proove increased utilization of its medically unnecessary tests.

70.     Further, another issue raised by the OIG Special Fraud Alert is that Registry Agreements are improper when the physician work does not actually advance clinical research and are not reasonable and necessary.

71.     Proove has misrepresented the effectiveness of it is tests and has yet to have their research presented in a peer reviewed professional journal.  Their claims that Proove's tests are 93% predictive of Opioid sensitivity is unsupported by the science, as stated above, and fraudulent.

## CONCLUSION

72.     As described above, Proove's tests are not medically necessary and thus not "reasonable and necessary" as required by §1862(a)(1)(A) of the Act.

9

73.     By virtue of the acts described above, Defendants knowingly (a) submitted and continue to submit, and (b) caused to be submitted, false or fraudulent claims to the United States Government for payment of false claims.

74.     Further, Proove fraudulently induced physicians to use its products by offering remuneration above fair market value to physicians engaged in its IRB protocol, which lead to corruption of medical judgment, overutilization, and increased costs to the Federal health care programs and beneficiaries in addition to unfair competition.  Such conduct is in violation of Stark 42 U.S.C. §1395 and Anti-Kickback statute 42 U.S.C. § 1320-7b.

75.     The Government paid and continues to pay such false claims.

76.     Proove is liable for between Five-Thousand ($5,000) Dollars and Ten-Thousand ($10,000) Dollars for each false claim submitted to the Government, plus three (3) times the amount of the fraud loss attributable to Proove's conduct.  31 U.S.C. §3729(a)(1)(G), or Fourteen-Million-Four-Hundred-Thirty-One-Thousand-Seven-Hundred-Sixty-Seven ($14,431,767) Dollars in damages and Twenty-Four-Million-Four-Hundred-Fifty-Eight-Thousand-Five-Hundred ($24,458,500) Dollars in fines for a total of Thirty-Eight-Million-Eight-Hundred-Ninety-Thousand-Two-Hundred-Sixty-Seven (**$38,890,267**) Dollars.

WHEREFORE, Plaintiff, Bruce Gardner on behalf of the United States of America, requests the Court enter the following relief:

   A. That Defendants be ordered to cease and desist from violating the statutes above, namely 31 U.S.C. §3729 et seq.

B. That this Court enter judgement against Defendants in the amount equal to three (3) times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than Five-Thousand ($5,500) Dollars and not more than Eleven-Thousand ($11,000) Dollars for each violation of 31 U.S.C.C. §3729.

Respectfully submitted,

CHAPMAN LAW GROUP

Dated: August 20, 2015

/s/ Ronald W. Chapman, II
Ronald W. Chapman (P37603)
Ronald W. Chapman, II (P73179)
Aaron J. Kemp (P55238)
*Attorney for Qui Tam Relator Bruce Gardner*
1441 W. Long Lake Road, Suite 310
Troy, MI 48098
(248) 644-6326
rwchapman@chapmanlawgroup.com

[CONTINUED NEXT PAGE]